IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. __:__-cv-_____-__

NOE AGUILAR-OCAMPO,         )
           )
     Plaintiff,         )
           )
v.           )        <u>COMPLAINT</u>
           )
NICOLAS BAHENA,        )
           )
     Defendant.       )
           )

## **PRELIMINARY STATEMENT**

1. This is an action by Noe Aguilar-Ocampo ("Plaintiff"), a foreign migrant agricultural worker who lawfully entered the United States pursuant to 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1184(c), and 1188(a)(1) ("the H-2A Program") to perform labor in agriculture in North Carolina for farm labor contractor, Nicolas Bahena ("Defendant"), during the 2021 agricultural season.

2. Defendant promised Plaintiff wages of at least the required hourly wage rate for H-2A agricultural workers in North Carolina in 2021. When Plaintiff arrived in North Carolina, after incurring expenses for his visa and travel, Defendant confiscated his passport, charged him a $2,800 surprise recruitment fee, had him work in nonagricultural work, and paid him less than the promised hourly wage rate and less than the minimum wage for one or more weeks.

3. Plaintiff brings this action to assert claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), the North Carolina Wage and Hour Act, N.C.G.S. §§ 95-25.1, *et seq.*

1

("NCWHA"), the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581 *et seq.* ("TVPRA"), and North Carolina common law.

4. Plaintiff seeks back wages, liquidated, compensatory, and punitive damages, pre- and post-judgment interest, cost of the action, attorneys' fees, and other appropriate relief to make himself whole for damages suffered due to the Defendant's violations of law.

## JURISDICTION

5. This Court has jurisdiction over this matter pursuant to:

    a. 28 U.S.C. § 1331 (Federal Question);

    b. 28 U.S.C. § 1337 (Interstate Commerce);

    c. 29 U.S.C. § 216(b) (FLSA);

    d. 18 U.S.C. § 1595(a) (TVPRA); and

    e. 28 U.S.C. § 1367 (Supplemental Jurisdiction).

6. This Court has supplemental jurisdiction over the state law claims because they are so related to Plaintiff's FLSA and TVPRA claims that they form part of the same case or controversy under Article III, Section 2 of the U.S. Constitution.

7. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because, at all times relevant to this Complaint, Defendant's regular and substantial business activities occurred in Harnett County and surrounding counties in North Carolina, and a substantial part of the events or omissions giving rise to the Plaintiff's claims were committed within the jurisdiction of the Eastern District of North Carolina.

2

## **PLAINTIFF**

9. Plaintiff Noe Aguilar-Ocampo is a citizen of Mexico who was admitted to the U.S. in 2021 on a temporary basis with an H-2A visa issued pursuant to the H-2A Program to perform agricultural labor in 2021 for Defendant in or around Harnett County, North Carolina.

10. At all times relevant to this Complaint, Defendant employed Plaintiff to perform agricultural and related work for Defendant in or around Harnett County, North Carolina, within the meaning of 29 U.S.C. §§ 203(d) and 203(g), N.C. Gen. Stat. §§ 95-25.2(3), 95-25.2(5), and 95-25.2(18), and 20 C.F.R. §§ 655.103(b) and 655.1300(c).

11. At all times relevant to this Complaint, Plaintiff was engaged in commerce or in the production of goods for commerce, or was employed in an enterprise engaged in commerce or in the production of goods for interstate commerce, within the meaning of 29 U.S.C. § 203(s)(1)(A) of the FLSA.

## **DEFENDANT**

12. Defendant Nicolas Bahena is and has been registered as a Farm Labor Contractor ("FLC") with the U.S. Department of Labor ("USDOL"), including but not limited to in the year 2021.

13. At all times relevant to this complaint, Defendant operated as an FLC, as defined by and in 29 U.S.C. § 1802(7), in that, for money or other valuable consideration paid or promised to be paid, he recruited, solicited, hired, furnished, and/or employed migrant agricultural workers, including Plaintiff.

14. Defendant's current FLC Certificate became valid on June 21, 2022, and it expires on June 20, 2024, and lists his residence as 143 Carroll Byrd Lane, Dunn, North Carolina 28334.

3

15. At all times relevant to this Complaint, Defendant was an employer of H-2A workers, including Plaintiff, as that term is defined in and by the H-2A regulations, 20 C.F.R. § 655.103(b), the FLSA, 29 U.S.C. § 203(d), and the NCWHA, N.C. Gen. Stat. § 95-25.2(5).

## STATEMENT OF FACTS

The H-2A and H-2B Temporary Work Visa Programs

16. An employer in the United States may import foreign workers to perform labor of a temporary nature in agriculture if the U.S. Department of Labor ("USDOL") certifies that (1) there are insufficient available workers within the United States to perform the job; and (2) the employment of foreign workers will not adversely affect the wages and working conditions of similarly situated U.S. workers.

17. The applicable regulations define "agriculture" as "farming in all its branches, including cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of agricultural or horticultural commodities, the raising of livestock, bees, fur-bearing animals, or poultry." 29 C.F.R. §780.105(b). It includes "any practices performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." 29 C.F.R. §780.105(c).

18. The agricultural employer then submits an Application for Temporary Employment Certification, Form ETA-9142A ("Application for an H-2A Workforce"), with a corresponding Agricultural and Food Processing Clearance Order ETA 790 ("Clearance Order") seeking permission to bring in and employ a specific number of H-2A workers within defined dates of need.

4

19. The Clearance Order must comply with applicable regulations for the recruitment of both U.S. and H-2A workers. 20 C.F.R. §§ 655.121(a)–(c). The H-2A regulations set the minimum benefits, wages, and working conditions that the employer must offer to avoid an adverse effect upon U.S. workers. 20 C.F.R. §§ 655.0(a)(2), 655.122, 655.135.

20. Employers seeking to import foreign workers pursuant to the H-2A program must assure in their Application to pay all employees at least the highest of the Adverse Effect Wage Rate ("AEWR"), the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage for every hour or portion thereof worked during a pay period. 20 C.F.R. §§ 653.501, 655.120(a), 655.122(l). The AEWR is recalculated every year, is higher than the federal minimum wage, and differs by state.

21. All H-2A employers are required to disclose the employment contract to all H-2A workers no later than the time at which the worker applies for a visa by providing a copy of the employment contract between the employer and the worker in a language understood by the worker. 20 C.F.R. § 655.122(q).

22. In addition to fixed-site agricultural operations, Farm Labor Contractors ("FLCs"), or crewleaders, are also permitted to apply to USDOL for temporary labor certification to employ H-2A workers if they meet all the requirements of the definition of an employer in 20 C.F.R. § 655.103(b) and comply with all of the assurances and obligations required of H-2A employers. 20 C.F.R. § 655.132.

23. FLCs who receive H-2A labor certification are known as H-2A Labor Contractors, or H-2ALCs.

24. H-2A Labor Contractors must also provide the name and location of each agricultural business for which it expects to provide H-2A workers, the expected start and end dates of one or more

jobs and a description of the crops and activities the workers will perform at each site. H-2A Labor Contractors must supplement their Application with copies of fully-executed work contracts with each fixed-site agricultural business identified. 20 C.F.R. § 655.132 (b) (1) and (4).

25. The terms and conditions of the Clearance Order constitute an employment contract between the employer and the H-2A workers.

26. The H-2B program is a separate visa classification from the H-2A program. Although the regulatory schemes are similar, the H-2A program is used by employers seeking to import foreign workers for temporary agricultural work and has no limit on the number of visas that may be issued in a given year.

27. The H-2B program is used by employers seeking to import foreign workers for ***non***agricultural work and has a cap on the number of visas that can be issued in a given year.

28. An employer in the United States may import foreign workers to perform nonagricultural labor of a temporary nature if the USDOL certifies that (1) there are insufficient available workers within the United States to perform the job; and (2) the employment of foreign workers will not adversely affect the wages and working conditions of similarly situated U.S. workers. 8 C.F.R. § 214.2(6)(iv)(A).

29. H-2B employers must pay H-2B workers at least the highest of the prevailing wage rate ("Prevailing Wage Rate"), or the applicable Federal, State, or local minimum wage. See 20 CFR § 655.20(a)(1) and 29 CFR § 503.16(a)(1). The Prevailing Wage Rate differs by job classification and geographical location.

30. In their Application for Temporary Employment Certification, H-2B employers are required to disclose all job duties when they seek to employ temporary foreign workers under the H-2B

program. H-2B employers cannot place any H-2B workers employed under the approved work order outside of the area of intended employment or in a job opportunity not listed on the approved work order. 20 CFR § 655.20(x) and 29 CFR § 503.16(x).

31. The H-2B regulations are carefully crafted to ensure that U.S. jobs and U.S. wages are not depressed by the influx of foreign labor allowed by the program. The regulation scheme ensures this by requiring that jobs are accurately disclosed to USDOL and by calculating the Prevailing Wage Rate based on discrete U.S. job markets. *See generally* 80 Fed. Reg. 24,146 (April 29, 2015).

Defendant's 2021 H-2A Program Participation

32. Defendant does not have his own fixed-site agricultural operation. As an H-2A Labor Contractor, Defendant furnishes H-2A labor to various farms.

33. Defendant contracted with Andrew Jackson Law ("Jackson"), in Clinton, North Carolina, as his agent to prepare and file his 2021 North Carolina Applications for an H-2A Workforce with the required federal and state agencies.

34. In early 2021, Defendant submitted an application for an H-2A Workforce ("2021 Tart Application") with a corresponding Agricultural and Food Processing Clearance Order ETA 790 ("2021 Tart Clearance Order") and received approval to bring 16 H-2A workers to North Carolina to perform work in agriculture.

35. A true and correct copy of the 2021 Tart Clearance Order is labeled Exhibit A and filed concurrently with this Complaint.

36. In the 2021 Tart Application, Defendant requested and was approved to hire 16 temporary foreign workers to hand-harvest pickles, sweet potatoes, strawberries, melons, squash, sweet

7

corn, and mixed vegetables during the 2021 North Carolina agricultural season from April 5, 2021 to December 20, 2021.

37. With the 2021 Tart Application, Defendant submitted a fixed-site operation work agreement signed by Charles M. Tart dated October 21, 2020 ("2021 Tart Work Agreement").

38. A true and correct copy of the 2021 Tart Work Agreement is labeled Exhibit B and filed concurrently with this Complaint.

39. In the 2021 Tart Application, Defendant did not request and USDOL did not approve Defendant to employ H-2A workers to perform landscaping and groundskeeping work under this order.

40. In the Order, Defendant certified his compliance with the assurances contained in 20 C.F.R. §§ 655.121, 655.122, and 655.135 including assurances that Defendant would:

    a. Maintain accurate and adequate records with respect to Plaintiff's earnings, records reflecting the nature and amount of work performed, the hours Plaintiff worked each day, the rate of pay, and the amount of and reasons for any and all deductions taken from Plaintiff's wages. 20 C.F.R. § 655.122(j);

    b. Pay all employees at least the highest of the Adverse Effect Wage Rate ("AEWR"), the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage for every hour or portion thereof worked during a pay period, 20 C.F.R. §§ 653.501, 655.120(a), 655.122(l);

    c. Not seek or receive payment of any kind from any employee for any activity related to obtaining H-2A labor certification, including payment of the employer's attorneys' fees, application fees, or recruitment costs. 20 C.F.R. § 655.135(j); and

d.   Comply with all applicable Federal, State and local laws and regulations, including, but not limited to, the FLSA, Title VII of the Civil Rights Act, and the TVPRA, 20 C.F.R. § 655.135(e).

41. Defendant also certified that the 2021 Tart Application contained all the material terms and conditions of the job.

42. Defendant signed the assurances contained in the 2021 Tart Application under penalty of perjury.

43. The applicable AEWR for North Carolina in 2021 for work performed during the 2021 Tart Application dates of need was $13.15 per hour. *See* 86 FR 10996 (Feb. 23, 2021).

Foreign Recruitment of Plaintiff

44. In or around March 2021, Plaintiff was doing agricultural work in Mexico when Defendant recruited him and others to travel to the United States to work on his farm labor crew on H-2A visas.

45. Defendant told Plaintiff that he would be working on a visa in North Carolina harvesting various crops, that he would be paid $12.67 an hour, and that at least 40 hours of work per week would be made available to him. Plaintiff accepted Defendant's offer of employment because the promised hourly pay was considerably higher than what was available to Plaintiff in his current job at the time in Mexico.

Travel from Home Country to Job Site

46. In reliance on Defendant's promises, Plaintiff depleted his savings and borrowed money from relatives to pay for transportation, food, visa fees, and lodging during travel to the United States.

9

47. Defendant's agent instructed Plaintiff to wire money to a Mexican bank account for the cost of the machine-readable visa prior to their trip to the U.S. Consulate in Monterrey.

48. In reliance on Defendant's promises, Plaintiff wired money required for the cost of the machine-readable visa to Defendant's agent.

49. Defendant's agent provided Plaintiff a copy of the Tart Clearance Order.

50. Plaintiff speaks Spanish and is not proficient in written or spoken English. Defendant failed to provide Plaintiff a copy of the work contract in a language he understands and failed to provide the contract prior to the time at which Plaintiff applied for the visa in violation of 20 C.F.R. 155.122(q).

51. Shortly thereafter, Defendant's agent contacted Plaintiff and instructed him to travel to Monterrey, Mexico in order to get his H-2A visa. Plaintiff incurred, at personal expense, the cost of travel from his home to the U.S. Consulate in Monterrey.

52. Defendant instructed Plaintiff to stay in a hotel in Monterrey near the U.S. Consulate for three days awaiting the issuance of his H-2A visa. Plaintiff incurred, at personal expense, the cost of lodging in Monterrey and the cost of travel between the hotel and the U.S. Consulate.

53. After receiving his H-2A visa, Defendant arranged for Plaintiff and other workers on his farm labor crew to be transported by van over the U.S.-Mexico border and eventually to Dunn, North Carolina where they disembarked. At the border, Plaintiff incurred, at personal expense, the border crossing fee.

54. During the approximately eight days that Plaintiff spent in transit from his home in Mexico to work for the Defendant in Dunn, North Carolina, Plaintiff incurred, at personal expense, the cost of his own food and drink.

Arrival in North Carolina, Surprise Recruitment Fee, and Passport Confiscation

55. Plaintiff and other workers on Defendant's farm labor crew arrived in Dunn, North Carolina on or around April 12, 2021.

56. Defendant housed Plaintiff in a small trailer at 1983 Savannah Hill Road, Dunn, North Carolina 28334.

57. When they first arrived, Defendant told Plaintiff and other workers that they were not allowed to leave the housing without prior approval from Defendant.

58. At the end of Plaintiff's first workday, Defendant confiscated Plaintiff's and other recently arrived workers' passports under the pretext that Defendant needed the passports to make copies.

59. Later, Plaintiff learned from other workers on Defendant's crew that it was Defendant's practice to retain workers' passports until the end of the contract period to coerce them to remain in his employ.

60. At the end of Plaintiff's first workday, Defendant informed Plaintiff that he owed Defendant $2,800 US Dollars to reimburse him for visa processing related fees and for travel from Monterrey to the worksite in North Carolina ("$2,800 Recruitment Fee"). Defendant had failed to disclose this unlawful fee to Plaintiff until this point.

61. Defendant took money from Plaintiff's paychecks for several workweeks to go towards the $2,800 Recruitment Fee. Plaintiff also felt obligated to set money aside from each paycheck in order to save the $2,800 that Defendant required.

Plaintiff's Work and Compensation

62. Defendant initially instructed Plaintiff to perform work on Defendant's farm labor crew.

63. Shortly after, Defendant also required Plaintiff to also perform work for a landscaping business owned and/or managed by Defendant and Defendant's relatives.

11

64. Defendant, by and through his agents and/or family members, managed Plaintiff's day-to-day work schedule and duties for the landscaping business. Defendant required Plaintiff to perform landscaping work at single-family homes as well as for businesses. Defendant frequently required Plaintiff to complete 8-10 landscaping jobs in a day.

65. Defendant also required Plaintiff to perform work loading and unloading plants for sale to the general public at various markets.

66. Defendant routinely required Plaintiff to perform landscaping and groundskeeping work, agricultural field work, and plant nursery work within the same 7-day workweek.

67. On payday each week, Defendant paid Plaintiff in cash and provided him with a paper wage statement.

68. Defendant fabricated information on Plaintiff's wage statements to appear as if Defendant was complying with the minimum requirements of an H-2A employer when, in fact, the wage statement failed to account for all hours worked and failed to state the actual pay rate applied, among other issues.

69. Each week, Defendant provided Plaintiff with wage statements that purported to pay Plaintiff the AEWR of $13.15 per hour for each hour Plaintiff worked that workweek.

70. However, Defendant actually paid Plaintiff a lower hourly wage rate because Defendant failed to account for all of Plaintiff's hours worked each week.

71. During some workweeks covered by this lawsuit, Defendant failed to pay Plaintiff at least the product of the FLSA federal minimum wage rate and his total hours worked.

72. For all workweeks covered by this lawsuit, Defendant failed to pay Plaintiff at least the product of the AEWR of $13.15 per hour and his total hours worked. Since the AEWR was the wage

promised by their employment contract and the H-2A regulations, Defendant thereby failed to pay the NCWHA promised wage when due.

73. For example, during the workweek and/or pay period ending on June 23, 2021, Plaintiff worked approximately 80 hours during the 7-day pay period, but Defendant only paid Plaintiff $552.30 and his wage statement reported that he only worked 42 hours.

74. Defendant also failed to reimburse Plaintiff during the first workweek for the fees he incurred in Mexico to get the job, including the H-2A visa fee he had to pay to the Defendant's agent in Mexico and his inbound subsistence costs, border crossing fee, transportation within Mexico, and lodging costs in Monterrey.

75. These fees and travel-related expenses were deductions from Plaintiff's pay incurred primarily for the benefit of the Defendant.

76. Defendant's failure to reimburse Plaintiff for these deductions incurred primarily for the benefit of the Defendant in his first workweek brought Plaintiff's pay below the FLSA minimum wage and the NCWHA promised wage for that first week.

77. Although Defendant routinely required Plaintiff to work more than 40 hours per week in non-agricultural work, Defendant failed to pay Plaintiff one and a half times his regular rate of pay for his hours worked over 40 hours in a workweek in those weeks he performed non-agricultural work.

78. Plaintiff had an express, constructive, or implied agreement with Defendant that Defendant would pay him wages at the rate required by any applicable federal and/or state law when those wages were due for each hour or part of an hour that the Plaintiff performed compensable work under the FLSA and/or the NCWHA for Defendant.

13

79. Several weeks after Plaintiff's start date, Defendant required Plaintiff to remit the remaining balance of the $2,800 Recruitment Fee. Plaintiff's payment of the balance of Defendant's illegal $2,800 Recruitment Fee charge brought Plaintiff's pay below the FLSA minimum wage and the NCWHA promised wage for that week.

80. For some workweeks covered by this lawsuit, Defendant required Plaintiff to complete landscaping and groundskeeping work duties that are typically subject to the Prevailing Wage Rate under the H-2B program. The 2021 Prevailing Wage Rate for landscaping and groundskeeping work in the relevant region of North Carolina was $15.20 per hour.

81. For those workweeks covered by this lawsuit in which Plaintiff worked in landscaping and groundskeeping, Defendant failed to pay Plaintiff at least the product of the landscaping and groundskeeping Prevailing Wage Rate of $15.20 per hour and his total hours worked.

Ongoing Work and Escape

82.  Defendant cultivated a climate of fear to compel Plaintiff to keep working for him.

83. Plaintiff felt as if he had no choice but to continue working for Defendant to repay debts he incurred to initially work for Defendant and Defendant's required $2,800 kickback of Plaintiff's wages.

84. Plaintiff also feared that Defendant would retaliate against him if he were to leave the employment. Defendant often threatened Plaintiff's coworkers that expressed discontent with threats of deportation and threats that Defendant could make them inadmissible to the U.S. in the future if they left his employ before the end of the contract period.

85. Because of Defendant's actions, Plaintiff felt compelled to continue to work for Defendant against his will.

86. Plaintiff escaped Defendant's labor camp the night of June 28, 2021.

87. On or around June 29, 2021, Plaintiff asked Defendant to assist in forwarding him his final paycheck and his passport by giving it to a former coworker. Defendant refused to provide these to Plaintiff at this time and demanded that Plaintiff return to collect these items.

88. In January 2023, Plaintiff was able to recover his passport with assistance from the Mexican Consulate.

89. Plaintiff was only able to recover his final paycheck from Defendant in March 2023, with the assistance of counsel.

## FIRST CLAIM FOR RELIEF

### (FAIR LABOR STANDARDS ACT: MINIMUM WAGE)

90. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

91. Plaintiff brings this claim for Defendant's violations of the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*

92. Plaintiff has consented in writing to bring this FLSA action and has filed his written consent with this Complaint.

93. A true and correct copy of the Plaintiff's FLSA Consent to Sue is labeled Exhibit C and filed concurrently with this Complaint.

94. Defendant violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), by failing to pay Plaintiff at least the product of the federal minimum wage of $7.25 and the total number of hours of labor performed in each workweek during which they were employed in at least three ways.

95. Defendant willfully failed to fully reimburse Plaintiff during his first week of employment for expenses incurred primarily for the benefit of Defendant, including Plaintiff's inbound

subsistence costs, lodging expenses near the U.S. Consulate, visa fees, issuance of Form I-94, and the full cost of travel from the place of recruitment to the jobsite, in violation of the FLSA.

96. When these expenses are calculated as deductions from his first week's pay, as required by law, they cause Plaintiff's first-week's wages to be less than the FLSA minimum wage.

97. Defendant required Plaintiff to remit a $2,800 recruitment fee, in violation of the FLSA.

98. When this fee is calculated as a deduction from the week he was required to remit the fee, it caused Plaintiff's wages for that week to be less than the FLSA minimum wage.

99. Defendant also failed to compensate Plaintiff at the minimum wage rate for all hours worked when Defendant failed to pay Plaintiff for each hour worked, in violation of the FLSA.

100.    Defendant knew that he was required to pay Plaintiff at least the Federal minimum wage for each hour worked during a workweek. As such, Defendant's failure to pay Plaintiff the minimum wage was willful within the meaning of 29 U.S.C. § 255.

101.    As a consequence of Defendant's willful violation of his rights under the FLSA, Plaintiff seeks unpaid minimum wages, plus an equal amount in liquidated damages, and costs and attorneys' fees, pursuant to 29 U.S.C. § 216(b).

## SECOND CLAIM FOR RELIEF

### (FAIR LABOR STANDARDS ACT: OVERTIME)

102.    Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

103.    Defendant failed to pay Plaintiff at the overtime rate required by 29 U.S.C. § 207 for each hour of work above forty hours in any workweek in which he worked more than forty hours and performed work where he was not engaged in agriculture, as described above in paragraphs 64-67.

104. Upon information and belief, Defendant's failure to pay Plaintiff overtime at a rate of one and a half times the promised wage was willful.

105. As a consequence of Defendant's willful violation of his rights under the FLSA, Plaintiff seeks unpaid overtime wages, plus an equal amount in liquidated damages, and costs and attorneys' fees, pursuant to 29 U.S.C. § 216(b).

## **THIRD CLAIM FOR RELIEF**

### (NORTH CAROLINA WAGE AND HOUR ACT)

106. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

107. Defendant failed to pay Plaintiff at least the promised wage for each hour or part of an hour that Plaintiff worked for Defendant for each workweek, in violation of N.C. Gen. Stat. § 95-25.6.

108. Defendant failed to reimburse Plaintiff during his first week of employment for expenses incurred primarily for the benefit of Defendant, including inbound subsistence costs, lodging expenses near the U.S. Consulate, visa fees, issuance of Form I-94, and the full cost of travel from the place of recruitment to the jobsite. Defendant's failure to fully reimburse Plaintiff during the first workweek caused his first week's earnings to be less than the promised wage.

109. Defendant failed to compensate Plaintiff the promised wage for all hours worked by not paying him for all hours worked in any workweek.

110. Defendant required Plaintiff to remit a $2,800 recruitment fee.

111. When this fee is calculated as a deduction from the week he was required to remit the fee, it caused Plaintiff's wages for that week to be less than the promised wage.

17

112. As a result of these actions, Defendant is in violation of Plaintiff's rights under N.C. Gen. Stat. §§ 95-26.6. Plaintiff has suffered damages in the form of unpaid wages and liquidated damages that may be recovered from Defendant under N.C. Gen. Stat. §§ 95-25.22(a) and 95-25.22(a)(1).

## FOURTH CLAIM FOR RELIEF

### (TVPRA – FORCED LABOR)

113. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

114. Plaintiff brings this civil claim pursuant to the civil remedy provisions of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a) against Defendant for violations of 18 U.S.C. § 1589(a).

115. Defendant knowingly threatened Plaintiff with serious harm, including financial, reputational and legal harm, to obtain labor and services of Plaintiff.

116. Defendant knowingly obtained Plaintiff's labor through abuse of the legal process by including false information in the Clearance Order and thereby using the H-2A Program in a manner for which the law was not intended.

117. Defendant also knowingly obtained Plaintiff's labor through abuse of the legal process by confiscating Plaintiff's passport thereby making Plaintiff susceptible to immigration consequences for not having his immigration documents.

118. Defendant implemented a scheme, pattern or plan to cause to believe that he or his family would experience serious harm if he did not continue to work for Defendant. This scheme, pattern or plan included, but was not limited to, false promises, withholding documents, debt, and limiting Plaintiff's movements.

119.  For these violations, Plaintiff has suffered injury and is entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

### FIFTH CLAIM FOR RELIEF

#### (TVPRA – HUMAN TRAFFICKING)

120.  Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

121.  Plaintiff brings this civil claim pursuant to the civil remedy provisions of the TVPRA against Defendant for violations of 18 U.S.C. § 1590.

122.  Defendant knowingly recruited, provided, or obtained Plaintiff's labor by various fraudulent and/or coercive means including:

    a.  Knowingly making false representations on the 2021 Application and accompanying 2021 Tart Clearance Order submitted to USDOL for approval;

    b.  Making fraudulent promises to Plaintiff regarding the terms of his working conditions in the U.S.;

    c.  Charging Plaintiff an illegal surprise fee upon his arrival to the U.S.; and

    d.  Confiscating Plaintiff's passport upon his arrival to the U.S.

123.  Through these activities, Defendant knowingly recruited, transported, and harbored Plaintiff to obtain his labor or services by:

    a.  Means of force, threats of force, physical restraint, or threats of physical restraint to Plaintiff or another person;

    b.  Means of serious harm or threats of serious harm to Plaintiff or another person;

    c.  Means of the abuse or threatened abuse of law or legal process; and

d. Means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

124. For these violations, Plaintiff has suffered injury and is entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

## SIXTH CLAIM FOR RELIEF

### (TVPRA: UNLAWFUL CONDUCT IN RESPECT TO DOCUMENTS IN FUTHERANCE OF TRAFFICKING)

125. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

126. Plaintiff brings this civil claim pursuant to the civil remedy provisions of the TVPRA against Defendant for violations of 18 U.S.C. § 1592.

127. Defendant knowingly removed and possessed Plaintiff's passport containing his H-2A visa.

128. Plaintiff suffered injury as a result of this violation and is entitled to recover damages, including punitive damages, and attorneys' fees pursuant to 18 U.S.C. § 1595(a).

## SEVENTH CLAIM FOR RELIEF

### (TVPRA: UNLAWFUL CONDUCT WITH RESPECT TO IMMIGRATION DOCUMENTS)

129. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

130. Plaintiff brings this civil claim pursuant to the civil remedy provisions of the TVPRA against Defendant for violations of 18 U.S.C. § 1597.

131. Defendant knowingly and with intent to defraud hired Plaintiff to work in North Carolina on an H-2A visa by making materially false promises or representations about the H-2A job opening.

132. In the course of hiring Plaintiff to perform work in North Carolina on an H-2A visa based on false promises or representations, Defendant knowingly confiscated and possessed Plaintiff's passport.

133. For these violations, Plaintiff has suffered injury and is entitled to recover damages, including punitive damages and attorneys' fees, pursuant to 18 U.S.C. § 1595(a).

## EIGHTH CLAIM FOR RELIEF

### (BREACH OF CONTRACT)

134. Plaintiff incorporates each of the allegations contained in the preceding paragraphs by reference.

135. As alleged and described above in this Complaint, Defendant violated his contractual duty to Plaintiff to pay all wages owed to Plaintiff when those wages were due, as required by the terms of the 2021 Clearance Order described above in this Complaint, and further described in and by 20 C.F.R. §§ 655.122, 655.1304, and 655.1305.

136. Defendant offered employment on the terms and conditions set out in the 2021 Tart Application and accompanying 2021 Tart Clearance Order.

137. Plaintiff accepted Defendant's offer.

138. Defendant breached the employment contract with Plaintiff by providing terms and conditions of employment that were materially different from those in the 2021 Tart Clearance Order including:

a. Defendant failed to pay Plaintiff the promised minimum hourly wage of $12.67 or the AEWR rate of $13.15.

b. Defendant failed to pay Plaintiff at least the applicable Federal minimum wage for each compensable hour of work in a workweek.

c. Defendant failed to provide reimbursement for visa and inbound transportation expenses.

d. Defendant failed to accurately record hours worked.

e. Defendant required Plaintiff to perform work duties not listed on the applicable clearance order.

f. Defendant charged a recruitment fee.

139.   Defendant's breach of the employment contract with Plaintiff caused substantial injuries.

140.   Defendant is liable to Plaintiff for the damages that arose naturally and according to the usual course of things from Defendant's breach, as provided by federal common law and/or North Carolina common law, including unpaid wages, damages arising from the delay, and prejudgment interest.

## JURY DEMAND

146.   Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an order:

(a) Finding that this Court has jurisdiction over Plaintiff's claims;

(b) Granting a jury trial on all issues so triable;

22

(c) Declaring that Defendant, by the acts and omissions describe above, willfully violated Plaintiff's rights under the minimum wage and overtime provisions of the FLSA at 29 U.S.C. §§ 206(a) and 207 as set forth in Plaintiff's First and Second Claims for Relief;

(d) Granting judgment in favor of Plaintiff on his FLSA claims and awarding Plaintiff monetary damages for unpaid minimum wages and unpaid overtime, plus liquidated damages in an equal amount and interest, costs, and attorneys' fees, as provided by 29 U.S.C. § 216(b);

(e) Declaring that Defendant, by the acts and omission described above, violated Plaintiff's rights under the provision of the North Carolina Wage and Hour Act, as set forth in Plaintiff's Third Claim for Relief.

(f) Granting judgment in favor of Plaintiff on his NCWHA claims and awarding Plaintiff monetary damages for unpaid minimum wages and unpaid overtime, plus liquidated damages in an equal amount and interest, court costs, and attorneys' fees, as provided by N.C. Gen. Stat. § 95-25.6.

(g) Declaring that Defendant, by the acts and omissions described above, violated Plaintiff's rights under the TVPRA at 18 U.S.C. §§ 1589, 1590, 1592, and 1597 as set forth in Plaintiff's Fourth, Fifth, Sixth, and Seventh Claims for Relief.

(h) Granting judgment in favor of Plaintiff for each of his TVPRA claims and awarding the amount of their damages, including punitive damages, and attorneys' fees;

(i) Granting judgment in favor of Plaintiff for his breach of contract claim based on North Carolina law and awarding compensatory damages as set forth in Plaintiff's Eighth Claim for Relief;

(j) Awarding Plaintiff pre- and post-judgment interest, as allowed by law;

(k) Awarding Plaintiff his costs; and

(l)  Granting such injunctive, declaratory, and further relief as this Court deems just and appropriate.

This the 13th day of April, 2023.

Respectfully submitted,

/s/ Michael Boyd
Michael Boyd
N.C. State Bar No. 57835
Legal Aid of North Carolina, Inc.
Farmworker Unit
P.O. Box 26626
Raleigh, NC 27611
Phone: (919) 856-2180
Email: MichaelB@legalaidnc.org

Attorney for Plaintiff

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| Exhibit A | 2021 Tart Clearance Order |
| Exhibit B | 2021 Tart Work Agreement |
| Exhibit C | Plaintiff's FLSA Consent to Sue |